**SO ORDERED.**

**SIGNED March 31, 2009.**



_____
**ROBERT SUMMERHAYS**
**UNITED STATES BANKRUPTCY JUDGE**
_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA

IN RE:

| | |
|---|---|
| SUNNYSIDE TIMBER, LLC | CASE NO. 00-51233 |
| SUNNYSIDE LAND, LLC, | CASE NO. 00-51234 |
| | |
| Debtors | Chapter 7 |

----------------------------------------------------------------
SUNNYSIDE LAND, LLC and
SUNNYSIDE TIMBER, LLC

VERSUS                                ADVERSARY NOS. 07-AP-5041
                                                  07-AP-5042
PAUL SIMS, S.C. OF OKALOOSA
CORPORATION, MATTIE M. KELLY
908 TRUST, CHARLES KENNETH
BRELAND, WATER CANYON
HOLDINGS, LLC, UTAH REVERSE
EXCHANGE, LLC and RANGE CREEK
HOLDINGS, LLC
----------------------------------------------------------------
                      REASONS FOR DECISION
----------------------------------------------------------------

The present matters before the court are motions for summary

judgment filed in the two above-captioned adversary proceedings.

These adversary proceedings were filed in two related bankruptcy

cases: <u>Sunnyside Timber, LLC</u>, 00-51233 (Chapter 7), and <u>Sunnyside Land, LLC</u>, 00-51234 (Chapter 7). The Debtors assert bid-rigging claims under 11 U.S.C. §363(n) in both adversary proceedings against Paul Sims ("Simms"), S.C. of Okaloosa ("SCO"), the Mattie M. Kelley 908 Trust (the "Mattie Kelley Trust" or the "Trust"), Charles Kenneth Breland, and three entities associated with Breland: Water Canyon Holdings, LLC, Utah Reverse Exchange, LLC, and Range Creek Holdings, LLC (the "Breland Entities" and, together with Charles Kenneth Breland, "Breland"). The parties have conducted discovery. Breland, Sims, and SCO filed a motion for summary judgment seeking dismissal of Plaintiffs' section 363(n) claims. The Mattie Kelley Trust filed a separate motion for summary judgment. The court took these motions under advisement after oral argument. After considering the parties' arguments, the summary judgment record, and the relevant authorities, the court is prepared to rule on the motions.

## BACKGROUND

In 2000, Sunnyside Land, L.L.C. ("Land"), and Sunnyside Timber, L.L.C. ("Timber", and, with "Land", "Debtors") filed petitions for relief under chapter 11 of the Bankruptcy Code. The cases were subsequently converted to chapter 7, and Elizabeth G. Andrus and Lucy G. Sikes were duly appointed chapter 7 trustees of Land and Timber, respectively (together, the "Trustees"). The

-2-

extensive background of the Sunnyside cases has been covered in detail by the court in prior written decisions. Accordingly, the following summarizes the background facts relevant to the present adversary proceeding and the motions for summary judgment.

In November 1997, the Debtors acquired approximately 26,000 acres of real property and timber in Utah (the "Utah Property") from William F. Barnes for purposes of harvesting timber. Debtors entered into promissory notes with Barnes (the "Sunnyside Notes") to finance the purchase. Timber also received a secured loan from St. Landry Bank. Barnes then collaterally assigned the Sunnyside Notes to Regions Bank & Trust ("Regions") as security for a loan. That obligation subsequently went into default and Regions threatened to foreclose. Prior to November 2000, an agreement was reached between Barnes and Sims, the sole shareholder of SCO, relating to the collection of the Sunnyside Notes. In order to prevent the foreclosure, Sims agreed to advance funds in exchange for sharing in the ultimate collection of the Sunnyside Notes. The Barnes Notes were subsequently sold by Regions to SCO and the collateral securing the Barnes Notes was assigned to SCO. Shortly after they purchased the Utah Property, the Debtors began efforts to harvest the timber from the property and, to that end, commissioned a contractor to construct a road on the property in order to harvest timber on the property. Difficulties with access

-3-

to the area arose pre-petition, and these difficulties appear to be the major factor resulting in the bankruptcy proceeding. The fall-out from the access problems resulted in extensive litigation in Utah state court and, ultimately, in the present bankruptcy cases. After protracted litigation, the Trustees, Regions, Sims, SCO, and the other major parties in the bankruptcy (with the exception of Barnes) reached a settlement that resolved most of the significant disputes in the bankruptcy. In this regard, the parties executed the Term Sheet as to Settlement of Sunnyside Land and Sunnyside Timber Litigation (the "Term Sheet"). The court entered an order approving the settlement on December 1, 2004.

The focus of the present adversary proceeding is the sale of the Utah Property pursuant 11 U.S.C. § 363, which was one of the central provisions of the parties' settlement. In that regard, the Term Sheet provided that:

   (1)   the Trustees were to conduct a sale pursuant to section 363;

   (2)   SCO would offer a credit bid of $6.3 million for the purchase of the Utah property owned by Land;

   (3)   SCO would also offer a credit bid of $3.3 million for the purchase of the timber owned by Timber;

   (4)   if SCO's bid was not exceeded, the Trustees would transfer the property to SCO free and clear of any liens, claims or other encumbrances; and

   (5)   if SCO's bid was exceeded by a cash offer, SCO would receive a minimum of $9.6 free and clear of any liens,

-4-

> claims or other encumbrances. All claims, liens and
> encumbrances would attach only to proceeds in excess of
> $9.6 million.

On January 11, 2005, the Trustees filed a Notice of Sale of Real Property and Standing Timber Free and Clear of All Liens, Mortgages, Claims, Interests and Encumbrances (the "Sale Notice") stating that the Trustees would conduct a sale of the Utah Property pursuant to 11 U.S.C. §363. The Sale Notice provided that the Trustees would sell the Utah Property to SCO or to the highest bidder at an auction set for February 1, 2005. The Sale Notice also included bidding procedures and requirements for prospective bidders. Specifically, the Sale Notice required bidders competing against SCO to submit a minimum cash bid of $9.7 million for the land and timber accompanied by a cash deposit of five percent (5%) of the amount bid. The Sale Notice further provided that competing bids and deposits had to be submitted to counsel for the Trustees at least five (5) business days before the auction – January 25, 2005 – and that the winning bidder had to close the sale within forty-five (45) days of the auction. The Sale Notice further required that bidders provide the Trustees with evidence of their financial qualifications and ability to close the sale within forty-five days. SCO was the only party to submit a bid for the Utah Property by the January 25th bid deadline. SCO submitted the minimum credit bid set forth in the Term Sheet – $9.6 million for

-5-

the land and timber.  On February 1, 2005, the court entered an order approving the sale of the Utah Property to SCO.  On June 30, 2005, Breland entered into a Purchase and Sale Agreement whereby he agreed to purchase the Utah Property from SCO for $13 million.  The parties closed this sale on July 22, 2005, and Regions funded $9,496,400 of the purchase price on behalf of Breland.

On June 1, 2007, Land and Timber filed the present adversary proceedings in their respective bankruptcy cases against Breland, the Breland Entities, Sims, SCO, and the Mattie Kelley Trust.  Sims was the former trustee of the Mattie Kelley Trust, and Plaintiffs contend that the Trust received some of the proceeds from the sale of the Utah Properties to Breland.  Plaintiffs allege that Defendants entered into an agreement to control the sale price of the Utah Property in violation of 11 U.S.C. §363(n).  Plaintiffs contend that Breland was a potential bidder for the Utah Property but agreed to purchase the Utah Property directly from SCO instead of submitting a competing bid in the section 363 sale.  As a result, Plaintiffs contend that SCO's opening $9.6 million credit bid was the sole bid, and that the estate would have obtained a higher sales price had Breland submitted a competing bid.  Following discovery, Defendants filed motions for summary judgment seeking dismissal of Plaintiffs' section 363(n) claims with prejudice.  Sims, SCO, Breland, and the Breland Entities filed a

-6-

joint motion for summary judgment.  The Mattie Kelley Trust filed a separate motion for summary judgment.

**DISCUSSION**

A.  <u>**The Standard for Summary Judgment**</u>.

Summary judgment is proper if the pleadings, discovery products on file, and affidavits show that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P 56(b).  The purpose of summary judgment is to pierce the pleadings and to assess the proof to determine whether there is a genuine need for trial.  <u>See</u> <u>Matsushita Electric Industries v. Zenith Radio Corp.</u> 475 U.S. 574, 587 (1986).  Summary judgment procedure is designed to isolate and dispose of factually unsupported claims or defenses.  <u>Celotex Corp.</u> <u>v. Catrett</u>, 477 U.S. 317, 323-24 (1986).  Where, as here, the movant does not bear the burden of persuasion, the movant may satisfy its summary judgment burden by pointing to an absence of evidence supporting an essential element of the non-moving party's claim.  <u>Id</u>. at 324-326.  Assuming that the movant has met this burden, the non-movant must come forward with "substantial evidence" supporting the essential elements challenged in the motion for summary judgment.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).  "Substantial evidence" is evidence that is sufficient to withstand a motion for direct verdict and to support

-7-

the verdict of a reasonable jury. <u>Id</u>. The non-movant cannot rely on unsupported assertions or arguments to survive summary judgment.

**B.** **<u>Are Plaintiffs' Section 363(n) Claims Barred by the One-Year Limitation of Rule 60(b)</u>?**

All Defendants move for summary judgment on the grounds that Plaintiffs' section 363(n) claims are barred by the one-year time limitation of Rule 60(b) of the Federal Rules of Civil Procedure. Section 363(n) provides that:

> "The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorney's fees, or expenses incurred in avoiding such sale or recovering such amount. In addition to any recovery under the preceding sentence, the court may grant judgment for punitive damages in favor of the estate and against any such party that entered into such an agreement in wilful disregard of this subsection."

Section 363(n) provides for either damages or avoidance of the sale. Where, as in the case of section 363(n), there is no express statute of limitations for a federally-created cause of action, federal courts ordinarily "borrow" the most analogous state statute of limitations of the forum state. <u>See</u> <u>Szybist v. Aircraft Acquisition Corporation (In re Taylorcraft Aviation Corp</u>., 163 B.R. 734 (Bankr. M.D. Pa. 1993); 2 Moore's Federal Practice ¶3.08[2] at

-8-

page 3-43. Most courts, however, apply the one-year time limit for a motion under Rule 60(b)(3) of the Federal Rules of Civil Procedure to section 363(n) avoidance actions. <u>See</u>, <u>e.g.</u>, <u>See Gazes v. Deplete (In re Clinton Street Food Corp.)</u>, 254 B.R. 523, 532 (Bankr. S.D.N.Y. 2000); <u>In re Taylorcraft Aviation Corp.</u>, 163 B.R. at 737. Rule 60(b) provides that:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>
> > (1) mistake, inadvertence, surprise, or excusable neglect;
> >
> > (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
> >
> > (3) **<u>fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party</u>**;
> >
> > (4) the judgment is void;
> >
> > (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
> >
> > (6) any other reason that justifies relief.

(emphasis added). Rule 60(c) provides that a motion seeking to set aside a judgment, order, or proceeding under Rule 60(b)(3) must be made "no more than a year after the entry of the judgment or order

-9-

or the date of the proceeding." Fed. R. Civ. P. 60(c)(1). This one-year time limit is not subject to tolling. See In re Clinton Street Food Corp., 254 B.R. at 532 (the one-year time period "is an absolute, outside limit").

Ordinarily, a section 363 sale order is res judicata with respect to any claims arising from the sale. Robertson v. Isomedix, Inc. (In re Int'l Nutronics, Inc.), 28 F3d 965, 968 (9th Cir. 1994). The power to avoid a sale order under section 363(n) is an express exception to the finality of the order. Id. However, the courts that apply the one-year time limit of Rule 60(b) to section 363(n) claims do so on the basis that the power to avoid a sale under section 363(n) is not "a wholly independent exception to the rules of finality" and is subject to the court's power to avoid an order or judgment under Rule 60(b). Id. In Nutronics, the court noted that Rule 9024 of the Federal Rules of Bankruptcy Procedure incorporates Rule 60, and that Rule 60 governs the circumstances under which a court may relieve a party from a final judgment or order. Accordingly, the court reasoned that an action to avoid a sale order under section 363 is essentially a request to relieve a party from a final order under Rule 60(b)(3) for "fraud...misrepresentation, or other misconduct of an adverse party" and thus subject to the one-year limitation of Rule 60(c). Id.

-10-

Plaintiffs' section 363(n) claims are barred if the one-year time limit of Rule 60(b) applies. The court's order approving the sale of the Utah Property to SCO was entered on February 3, 2005. The present action was commenced on May 31, 2007 – over two years after entry of the sale order. However, Plaintiffs contend that Rule 60(b) does not apply to the present case because Plaintiffs have asserted only claims for damages. Plaintiffs argue that the cases relied on by Defendants are applicable only to requests under section 363(n) to avoid or modify final sales orders. At least two courts addressing this issue have concluded that the one-year limitation of Rule 60 does not apply to claims for damages under section 363(n). _See_ _In re Taylorcraft Aviation Corp._, 163 B.R. at 737; _In re American Paper Mills of Vermont_, 322 B.R. 84, 90-91 (Bankr. D. Vt. 2004). In _American Paper Mills_, the court held that a section 363(n) claim for damages that does not seek avoidance of the sale is not the equivalent of a Rule 60(b) motion for relief, and thus is not subject to that rule's one-year time limit. The court concluded that the appropriate statute of limitations for a section 363(n) damages action was Vermont's statute of limitations for a fraud action. _See also_ _In re Taylorcraft Aviation Corp._, 163 B.R. at 737-738 (while actions to avoid a sale order under grounds contemplated by Rule 60 may be subject to that rule's one-

-11-

year time limit, not all section 363(n) claims are subject to Rule 60).

At least one court has applied the one-year time limit of Rule 60 to a section 363(n) damages claim.  See In re Clinton Street Food Corp., 254 B.R. at 531.  The American Paper Mills court distinguished Clinton Street on the grounds that the court in that case relied heavily on the "law of the case" by following the unpublished opinion of a prior judge which held that the one-year time limit of Rule 60 applies to both equitable and legal claims brought under section 363(n).  In re American Paper Mills of Vermont, 322 B.R. at 90 n.3.  Moreover, the trustee in Clinton Street asserted not only a claim for damages, but also sought to avoid the sale.  The American Paper Mills court observed that the Clinton Street case was less persuasive than the Taylorcraft case because the Clinton Street court did not address the merits of whether Rule 60 should apply to a damages claim, but adopted the prior judge's ruling as the law of the case.

The court finds the reasoning of the American Paper Mills and Taylorcraft Aviation decisions more persuasive than the reasoning of the Clinton Street case.  The section 363(n) cases that adopt the one-year time limit of Rule 60 are avoidance cases where the plaintiff seeks to modify or vacate a sale order.  The rationale for applying the one-year time limit of Rule 60 in this context is

-12-

that the avoidance remedy of section 363(n) is derived from the power to vacate an order under Rule 60, and thus must be subject to the limitations of that rule. Even if this analysis is correct, the linkage to Rule 60 breaks down when a plaintiff is asserting only a claim for damages under section 363(n). A section 363(n) damages claim does not seek to vacate or modify the court's order approving the sale. It is true that a damages claim under section 363(n) essentially re-litigates the findings underlying the approval of a sale under section 363, such as the court's finding that the parties to the sale acted in good faith. However, this is a matter of the res judicata effect of the order, and courts have clearly held that a section 363(n) action is an exception to the res judicata effect of a sales order.

Given the court's conclusion that Rule 60 does not limit the time period for Plaintiffs' section 363(n) damages claim, the limitations period applicable to this claim is the most analogous limitations period provided under Louisiana law. <u>See</u> <u>In re American Paper Mills of Vermont</u>, 322 B.R. at 90-91 (applying the most analogous limitations period provided by the law of the forum state). The most analogous limitations period under Louisiana law is the one-year liberative prescription period applicable to delictual actions. La. Civ. Code art. 3492. Prescription commences on the date an injured party discovers or should have

-13-

discovered facts upon which his or her cause of action is based. See <u>Quibodeaux v. Medical Center of Southwest Louisiana</u>, 707 So.2d 1380 (La.App. 3d Cir. 1998); <u>Jones v. Honeywell Int., Inc.</u>, 295 F.Supp2d 652 (M.D. La. 2003). Unlike the one-year time limit of Rule 60, the running of prescription under Louisiana law may be tolled by the doctrine of *contra non valentem*. The grounds that trigger this doctrine include cases where a cause of action is not known or reasonably knowable to the plaintiff, even though this ignorance is not induced by the defendant. <u>See</u>, <u>e.g.</u>, <u>F.D.I.C. v. Barton</u>, 96 F.3d 128 (5th Cir. 1996). Defendants contend that prescription commenced at the time of the Trustees' section 363 sale because Plaintiffs had sufficient facts to place them on notice of a potential claim. Plaintiffs counter that none of negotiations or agreements between Breland and Sims that are the subject of their claims were disclosed prior to the sale. Plaintiffs contend that they did not learn of Defendants' alleged collusion until Breland was deposed during a June 23, 2006 deposition in another case - less than a year before this proceeding was filed. Plaintiffs offer the deposition testimony of Breland as well as an affidavit of John Luster, former counsel for the Trustees, to support their contention that they were unaware of any negotiations or agreements between Sims and Breland. After considering the summary judgment record as a whole, the court

-14-

concludes that Plaintiffs have offered substantial evidence supporting their position that this suit was filed within the one-year prescription period. Accordingly, genuine issues of material fact preclude summary judgment on the grounds of prescription.

C. **The Motions for Summary Judgment Filed by Sims, SCO, and Breland.**

Sims, SCO and Breland further move for summary judgment on the basis that the record lacks substantial evidence to support essential elements of Plaintiffs' section 363(n) claims. Defendants contend that there is no evidence of any collusive agreement designed to control the sale price of the Utah Property. Defendants also contend that Breland could not have been a "potential bidder" as required by section 363(n) because he did not have the money or the financing in place to satisfy the requirements of the Sale Notice.

1. **The Elements of a Section 363(n) Claim.**

Courts have articulated three essential elements of a section 363(n) claim:

(1) There must be an agreement;

(2) between potential bidders;

(3) that controls the price at bidding.

See Birdsell v. Fort McDowell Sand & Gravel (In re Sanner), 218 B.R. 941 (Bankr. D. Ariz. 1998). An agreement proscribed by

-15-

section 363(n) need not be an explicit written agreement, but may be an oral agreement to collude or an agreement inferred from the behavior of the parties or the circumstances. <u>See</u> <u>Loan Star Industries, Inc. v. Compania Naviera Perez Companc., Sudacia (In re N.Y. Trap Rock Corp.)</u>, 42 F.3d 747, 753 (2nd Cir. 1994). Although section 363(n) does not refer to the parties' intent, courts have held that an agreement "controls the sale price" within the meaning of section 363(n) only when an intended objective of the agreement is to control the sale price. <u>See</u> <u>N. Y. Trap Rock Corp.</u>, 42 F.3rd. 747. Section 363(n) does not proscribe agreements that only have the unintended consequence of affecting the sale price. <u>Id.</u>; <u>Boyer v. Gildea</u>, 374 B.R. 645 (N.D. Ind. 2007). The agreement must also actually control the sale price. <u>See</u> <u>Sanner</u>, 218 B.R. 941.

> **2. Presence of an Agreement Intended to Control The Sale Price of the Utah Property.**

In this case, as in most section 363(n) cases, Plaintiffs must rely on circumstantial evidence of the parties' actions and the timing of those actions to support an inference that the parties agreed to collude. In order to determine whether Plaintiffs have satisfied their summary judgment burden, the court must assess the reasonable inferences that can be drawn from the evidence in the summary judgment record. These inferences must then be considered in light of any competing inferences of independent or non-

-16-

collusive conduct. See Boyer v. Gildea, 374 B.R. 645, 660-62 (N.D. Ind. 2007). Not all agreements among potential bidders give rise to a claim under section 363(n). Section 363(n) only forecloses those agreements whose purpose is to control the sale price resulting from a section 363 sale. For example, two parties who, individually, lack the resources to purchase property in a section 363 sale may agree to cooperate and submit a joint bid. If the purpose of this joint bid is to provide the parties with a means to participate in the sale when they otherwise would be unable to submit individual bids, the agreement likely would not support a claim under section 363(n). See, e.g., Boyer v. Gildea, No. 1:05-CV-129, 2006 WL 2868924 at *15 (N.D. Ind. Oct. 5, 2006). The determining factor is the intent or purpose of the agreement.[1]

_____

[1]The Boyer case raises the question of the proper standard for assessing the reasonableness of inferences of collusion at the summary judgment stage. The court in Boyer originally suggested that any inferences of collusive conduct had to be stronger (or more reasonable) than competing inferences of independent or non-collusive conduct. 2006 WL 2868924 at *14-15. The Boyer court adopted this heightened standard from case law addressing the level of proof necessary to establish the presence of a contract or conspiracy to restrain trade or commerce in violation of § 1 of the Sherman Act. Id. (citing Serfecz v. Jewel Food Stores, 67 F.3d 591, 599 (7th Cir.1995)). Applying this standard, the court granted summary judgment dismissing the trustee's section 363(n) claims. On rehearing, the Boyer court vacated the original dismissal and ruled that there were genuine questions of material fact with respect to the trustee's section 363(n) claims. The court also noted that its decision was not based on a heightened summary judgment standard, and that the court was not ruling on the applicability of a

-17-

Plaintiffs contend that Breland and Sims tacitly agreed that Breland would not to submit a competing bid for the Utah Property in the Trustees' section 363 sale, but would instead buy the property from SCO after the sale under the terms of a January 27, 2005 "Letter of Intent" signed by Breland and Sims.  <u>See</u> Exhibit 40 to the Affidavit of Stephen Durio ("Durio Affidavit").[2]  The Letter of Intent proposed that Breland would purchase the Utah Property from Sims and SCO for a price "not to exceed" $11,946,000.  <u>Id</u>. The Letter of Intent provided that Breland's purchase price would be reduced by the amount of any recovery from "associated lawsuits

---

heightened standard in section 363(n) cases.  <u>Boyer</u>, 374 B.R. at 662.  While <u>Boyer</u> has been cited frequently in other reported decisions, this court has not located another section 363(n) case requiring a trustee to establish that the inferences of collusive conduct are stronger or more reasonable than competing inferences in order to survive summary judgment.  The court agrees with <u>Boyer</u> that, on summary judgment, the court should assess the reasonableness of the inferences of collusive conduct in light of any competing inferences of independent or non-collusive conduct. However, if a reasonable trier of fact could find that the defendants engaged in collusive conduct after considering any inferences of non-collusive conduct supported by the evidence, a court should not grant summary judgment.  This standard is consistent with the approach of courts addressing section 363(n) claims in the context of summary judgment.  It is also consistent with Supreme Court precedent on summary judgment.  <u>See</u>, <u>e.g.</u>, <u>Liberty Lobby</u>, 477 U.S. at 250.  The court declines to adopt a standard that departs from this precedent.

[2]Plaintiffs submitted the Durio Affidavit and the exhibits to that affidavit with their Opposition to the motion for summary judgment.

and/or the sale of property currently under litigation in Palestine, Texas." Id. Plaintiffs contend that the January 27th Letter of Intent reflected on-going negotiations between Breland and Sims prior to the Trustees' section 363 sale, and point to drafts of the Letter of Intent dated as early as February 26, 2004. See Exhibits 26, 30, 35, and 39 to Durio Affidavit. Plaintiffs also point to Breland's testimony from a June 23, 2006 deposition taken in a related case (the FATCO litigation) as an acknowledgment that Breland had agreed not to bid against Sims and SCO:

> Q. Is there any reason why you didn't bid on the property at the bankruptcy sale itself?
>
> A. There probably was at the time.
>
> Q. Let me simplify it. Were you aware whether or not that would fit with you 1031 plans?
>
> A. There were some discussions. We were dealing with Mr. Sims and he asked us not to do that. That sounds rather simplistic, but I just kind of didn't want to go in there and bid in the bankruptcy. I didn't know if there was going to be enough money to pay everyone off. I didn't know how it was all going to go. So I just kind of – I kind of sat back.
>
> Q. You appreciated that Mr. Sims already had enough problems; is that fair?
>
> A. Well, basically I gave him a commitment that we'd work through it, and that's the way it was.

See Exhibit B to Plaintiffs' Opposition at pp. 29-31.

As far as the required "intent to control" element of a section 363(n) claim, Plaintiffs contend that the record supports

-19-

a reasonable inference that the purpose of Sims' and Breland's agreement was to maintain the sale price of the Utah Property at SCO's required $9.6 million opening credit bid. In this regard, Plaintiffs point the parties' actions prior to the auction date. In a letter dated January 25, 2005, SCO's counsel proposed to increase SCO's opening credit bid to $10,711,013.91. See Defendants' Opposition at 42. Sims and SCO never pursued the higher bid, and Plaintiffs argue that Sims' decision not to increase SCO's bid together with the subsequent execution of the Letter of Intent evidence a tacit agreement with Breland not to submit competing bids. Plaintiffs further contend that Breland had an incentive to purchase the Utah Property from Sims and SCO because he believed that he could obtain the property at a lower cost based on the terms of the January 27th Letter of Intent than if he had to outbid Sims and SCO for property. Plaintiffs point to deposition testimony indicating that Sims told Breland that he was willing to bid up the sale price for the Utah Property to at least $11,946,000 in order to "get back what he had in it." See Exhibit V to Plaintiffs' Opposition. According to Plaintiffs, it is reasonable to infer that, at the time of the section 363 sale, Breland believed that he could purchase the Utah Property at a lower cost by allowing SCO to obtain the property at $9.6 million and then purchasing the property from SCO under the terms of the

-20-

January 27th Letter of Intent. Plaintiffs further point out that Breland's price under the Letter of Intent was "not to exceed" $11,946,000, and that this price would be reduced by any of the litigation or sales proceeds referenced in Letter of Intent.

Defendants' Motion challenges the inferences of collusive conduct by offering an independent, non-collusive explanation for Breland's and Sims' conduct in connection with the sale. According to Defendants, Breland did not submit a bid prior to the sale of the Utah Property because he did not have the cash or financing in place to satisfy the bidding requirements in the Trustees' Sale Notice. Defendants point to Breland's deposition testimony in the present case that (1) he never agreed to refrain from submitting a bid in the section 363 sale, (2) he did not submit a bid because he did not have the funds or financing in place to close on the property within forty-five days of the auction as required by the Sale Notice, and (3) he would have submitted a bid by the January 25th bidding deadline if he had the funds to do so. See Exhibit A to Defendants' Reply Memorandum [Docket No. 109]. Defendants contend that Breland was not in a position to purchase the Utah Property until March 2005, when he entered into contracts to sell two of his real estate projects in Alabama and Florida. See Exhibits M and N to Defendants' Motion for Summary Judgment. With these contracts in place, Breland was then able to obtain temporary

-21-

financing from Regions to purchase the Utah Property from SCO In July 2005. <u>See</u> Exhibits P to Defendants' Motion for Summary Judgment. In fact, Breland attempted to submit a late bid in April 2005 to the Trustees after the contracts were executed for the Alabama and Florida projects, but the Trustees rejected Breland's bid because the court had already approved the sale to SCO. Finally, Defendants point to the $13 million purchase price that Breland ultimately paid to SCO for the Utah Property in June 2005, and argue that Breland had no incentive to collude with Sims because he would have paid a lower price for the property by participating in the section 363 sale.

After reviewing the summary judgment record, the court concludes that there is a genuine question of material fact as to whether Breland and Sims entered into an agreement with the intent to control the sale price of the Utah Property. The timing of Breland's negotiations with Sims prior to the section 363 sale, the timing of the execution and terms of the January 27th Letter of Intent, the fact that Breland did not participate in the February 1st sale, and Breland's June 26, 2006 deposition testimony support a reasonable inference that Breland agreed with Sims not to submit a competing bid in the section 363 sale, and that the intent of the agreement was to control the sale price of the Utah Property. Courts have held that an agreement by potential bidders not to

-22-

submit competing bids creates a triable issue as to whether the intent of the agreement was to control the sale price. See Boyer, 374 B.R. at 660 (such as agreement "would likely have as its intent a desire to influence the sale price at auction"); see also Sanner, 218 B.R. at 947 (an agreement not to compete creates a triable issue as to the intent of the agreement). This inference is further buttressed by the fact that neither the January 27th Letter of Intent nor the negotiations between Breland and Sims were disclosed to the court or the Trustees prior to the February 1st sale date. The failure to disclose agreements among potential bidders is a factor that the court may consider in determining whether the evidence supports an inference of collusive conduct. See, e.g., In re New York Trap Rock Corp., 42 F.3d at 766(2nd Cir. 1994); Kabro Assoc. Of West Islip v. Colony Hill Assoc. (In re Colony Hill Assoc.), 111 F.3d 269, 277 (2nd Cir. 1997).

Defendants contend that any inference of collusion should be considered in light of evidence supporting an inference of independent or non-collusive action. Defendants contend that Breland did not participate in the Trustees' section 363 sale because he could not satisfy the Trustees' bidding requirements, and they point to evidence in the record to support this explanation. While the record may support this independent, non-

collusive explanation for the parties' conduct, it does not entitle Defendants to summary judgment. Plaintiffs point to evidence in the record supporting an opposing inference that Breland could have obtained the financing needed to participate in the Trustees' section 363 sale prior to the bidding deadline. For example, the record includes an April 26, 2005 letter from a Regions vice president. Breland submitted this letter to the Trustees when he attempted to submit a bid in April 2005. This letter described the projects that Regions had financed for Breland in the past and stated that "the proposed purchase of the Utah property is well within Mr. Breland's capabilities." Exhibit 51 to Durio Affidavit. This letter states that the total "gross sales" of Breland's projects "will exceed $600,000,000." Id. This letter makes no mention of the sale of the Florida and Alabama Projects, or that Breland's ability to fund a purchase of the Utah Property was contingent on the sale of these projects. Based on this letter and Breland's ability to finance much larger projects through Regions in the past, a trier of fact could reasonably conclude that Breland could have arranged financing prior to the January 25th bidding deadline. Moreover, while Defendants rely on Breland's deposition testimony to show that there was no collusive agreement between Breland and Sims, Breland never cited his lack of cash or financing

-24-

when he testified in the June 2006 deposition taken prior to the commencement of this proceeding. A trier of fact could reasonably find the earlier testimony more credible. In the end, the record reveals a genuine question of material fact as to whether the parties' actions resulted from a collusive agreement to control the sale price or Breland's inability to participate in the February 1st sale.

Defendants' arguments with respect to Breland's incentive to collude and the enforceability of the Letter of Intent similarly do not entitle Defendants to summary judgment. Even though Breland ultimately paid more for the Utah Property than the amount set forth in the Letter of Intent, the record supports a reasonable inference that, at the time of the February 1st sale, Breland believed that he could obtain a better price for the Utah Property if he did not have to competitively bid against Sims and SCO. As with the evidence pertaining to Breland's financial capacity, Breland's incentive to collude presents a genuine question of material fact. Finally, Defendants contend that Plaintiffs cannot rely on the January 27th Letter of Intent to support their claims because the agreement was not an enforceable contract. The flaw in Defendants' argument is that Plaintiffs' section 363(n) claim is not grounded on the Letter of Intent, but on an alleged tacit agreement to collude. In other words, the Letter of Intent

-25-

supports the inference of a bid-rigging agreement proscribed by Section 363(n), but it is not by itself a bid-rigging agreement. Courts have uniformly held that an agreement to collude within the meaning of section 363(n) need not be reflected in an enforceable written agreement, but may be a tacit agreement consisting of an oral agreement and/or multiple written agreements. <u>In re N.Y. Trap Rock Corp</u>., 42 F.3d 747 (2nd Cir. 1994); <u>Boyer</u>, 374 B.R. at 661.

### 3. Was Breland a Potential Bidder at the §363 Sale?

Breland, Sims, and SCO also move for summary judgment on the grounds that Breland was not a potential bidder under section 363(n) because he lacked the cash or financing to satisfy the requirements of the Sale Notice. As explained previously, the court concludes that there are genuine questions of material fact as to whether Breland could have satisfied these financial requirements. Courts have construed the "potential bidder" element of section 363(n) broadly to include parties who express an interest in the sale, but who do not actually submit a bid. <u>Boyer</u>, 2006 WL 2868924 at *14-17. Given this broad definition and the evidence in the summary judgment record showing Breland's interest in the Utah Property prior to the section 363 sale, the court concludes that there is a triable issue as to whether Breland was a potential bidder within the meaning of section 363(n).

-26-

### 4.  Conclusion.

In sum, Plaintiffs have met their summary judgment burden with respect to their claims against Breland, the Breland Entities, Sims, and SCO by producing "substantial evidence" supporting each essential element of their section 363(n) claims.  Accordingly, the motions for summary judgment submitted by these defendants in 07-5041 and 07-5042 are denied.  Within 20 days, counsel for Plaintiffs shall submit an Order in conformity with the foregoing reasons.

**D.  <u>The Mattie Kelley Trust's Motions for Summary Judgment</u>.**

Defendant Mattie Kelley Trust also moves for summary judgment on the grounds (1) that it was not a party to any collusive agreement among Breland, Sims, and SCO and (2) that it was not a potential bidder for the Utah Properties.  The summary judgment record shows that Sims was formerly the trustee of the Mattie Kelley Trust.  The Trust contends that Sims used Trust assets to fund acquisitions through SCO.  Beneficiaries of the Mattie Kelley Trust commenced litigation against Sims and SCO in Florida state court beginning in 2000.  In May 2004, the Florida state court removed Sims as trustee and enjoined him from taking any actions with respect to property of the Trust.  The Trust then filed an involuntary bankruptcy proceeding against SCO.  According to the Trust, the bankruptcy case was dismissed.  The Mattie Kelley Trust

-27-

was not a party to the settlement agreement among Plaintiffs, Sims, and SCO, nor are they creditors in either of the Sunnyside bankruptcy cases.

The Mattie Kelley Trust contends that it was not a party to any agreements among Breland, Sims and SCO, and that the Trust was not a bidder or participant in the sale of the Utah Properties. The Trust was not a party to the January 27th Letter of Intent and did not directly participate in any negotiations with Breland. Plaintiffs do not contend that the Trust was a party to the January 27th Letter of Intent, or that the Trust was a direct party to any agreement between Sims and Breland. Instead, Plaintiffs contend that the Mattie Kelley Trust is liable for Sims' conduct in connection with the Section 363 sale because Sims was acting as the Trust's agent. Alternatively, Plaintiffs contend that Sims was the alter ego of the Trust.

The elements of a section 363(n) claim are governed by federal bankruptcy law. However, bankruptcy courts will look to relevant state law when the Bankruptcy Code is silent. <u>Butner v. United States</u>, 440 U.S. 48 (1979). Whether the Mattie Kelley Trust is liable on the grounds of agency law or the alter ego doctrine is a matter of state law, and the court will accordingly look to state law for guidance. Plaintiffs cite Florida law on agency and the alter ego doctrine. The Mattie Kelley Trust is organized under

-28-

Florida law, and Sims is a Florida resident. Accordingly, Florida is the nexus of their relationship. The Mattie Kelley Trust does not dispute the applicability of Florida law. Florida law imposes three requirements for the creation of an agency relationship: "(1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." <u>Goldschmidt v. Holman</u>, 571 So. 2d 422, 424 (Fla. 1990) (quoting Restatement (Second) of Agency §1 (1975)). Under Florida law, an agency relationship is a question of fact that must be analyzed by examining the totality of the circumstances. <u>See</u> <u>Villazon v. Prudential Health Care Plan, Inc.</u>, 843 So. 2d 842, 853-54 (Fla. 2003). However, in order to survive summary judgment, Plaintiffs must point to substantial evidence supporting each element required to establish an agency relationship under Florida law.

After reviewing the summary judgment record, the court concludes that Plaintiffs have not come forward with substantial evidence supporting the first requirement under Florida law for establishing an agency relationship: an acknowledgment by the Mattie Kelley Trust that Sims was to act as its agent in connection with Sims' negotiations with Breland and the sale of the Utah Property. While Sims may have acted as the agent for the Trust when he served as its trustee, the Trust contends that this agency

-29-

relationship was terminated when Sims was removed as trustee and explicitly barred from taking any actions with respect to property of the Trust. The summary judgment record includes this Florida state court order. The Mattie Kelley Trust also submitted affidavits by its current trustees stating that Sims was never authorized by the Trust to act as its agent in connection with the Trustees' section 363 sale. Nor does the evidence in the summary judgement record indicate that Sims was acting on behalf of the Mattie Kelley Trust in negotiating the January 27th Letter of Intent. Sims and Breland were the signatories of the Letter of Intent, not the Trust. The terms of the Letter of Intent evidence a transaction between Sims/SCO and Breland, not the Trust. Nothing in the Letter of Intent or the summary judgment record indicates that any agreement between Breland and Sims/SCO – whether an agreement to purchase the Utah Property from SCO or an agreement to control the sale price – was made by Sims on behalf of the Trust. To the extent that the record reflects efforts by the Trust to enforce its rights under the Florida state court order, or its rights as a creditor of SCO, the Trust's actions do not, standing alone, support a reasonable inference that Sims was acting as an agent of the Trust. Conclusory statements that the Trust entered into a collusive agreement with Breland through Sims as its agent/alter ego are not sufficient to survive summary judgment.

-30-

Plaintiffs' Opposition also makes reference to "apparent authority" and "ratification" as grounds to support a section 363(n) claim against the Mattie Kelley Trust. The elements of apparent agency under Florida law are "(a) a representation by the purported principal; (b) a reliance on that representation by a third party; and (c) a change in position by the third party in reliance on the representation." Mobil Oil Corp. v. Bransford, 648 So.2d 119, 121 (Fla. 1995). As explained with respect to Plaintiffs' theory of actual agency, the record contains no evidence of any representation made by the Trust suggesting that Sims or SCO had authority to act on its behalf with respect to Breland's purchase of the Utah Properties or with respect to any agreement concerning the parties' bidding in the section 363 sale. Accordingly, Plaintiffs cannot rely on apparent agency. Similarly, the Florida cases discussing the ratification of an agent's acts presuppose the existence of an agency relationship. Frankenmuth Mut. Ins. Co. v. Magaha, 769 So.2d 1012, (Fla. Ct. App. 200). Furthermore, "[b]efore ratification will be implied of an act of an unauthorized agent it must be made to appear that the principal has been fully informed and that he has approved." Id. The record does not support any inferences that the Mattie Kelley Trust was "fully informed" of any collusive agreement between Breland and Sims, or that the Trust approved any such agreement after the fact.

-31-

Finally, Plaintiffs' alter ego allegations suffer from the same fatal flaw as their agency allegations. Under Florida law, liability may be imposed under the alter ego doctrine where a corporation is a mere instrumentality or alter ego of the defendant, and where the corporate form was misused to accomplish fraud or some other illegal purpose. In re Brickell Investment Corp., 85 B.R. 164, 167 (Bankr. S.D. Fla. 1988); Steinhardt v. Banks, 511 So.2d 336, 339 (Fla. Ct. App. 1987). In the present case, the record shows actions taken by the Mattie Kelley Trust to enforce its rights under the Florida state court order and its rights with respect to loans made by the Trust to SCO. However, the Trust's actions in enforcing these rights do not, without more, rise to the level of fraudulent conduct or a "illegal purpose" as required to pierce the corporate veil under Florida law. Steinhardt, 511 So.2d at 338 (requiring evidence of fraud or improper conduct to support alter ego finding). Accordingly, the court concludes that Plaintiffs have not carried their burden with respect to their section 363(n) claim against the Mattie Kelley Trust. The section 363(n) claims against the Trust in both adversary proceedings are therefore dismissed with prejudice.

Based upon the foregoing, the Trust's Motion for Summary Judgment is GRANTED. Counsel for the Trust shall submit an Order in conformity with the foregoing reasons within 20 days.

###

-32-